******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* MICHAEL
ANTHONY EDWARDS
(SC 19049)

Palmer, Zarella, Eveleigh, McDonald and Espinosa, Js.

*Argued December 9, 2013—officially released November 11, 2014*

*Glenn W. Falk*, assigned counsel, for the appellant (defendant).

*Kathryn W. Bare*, assistant state's attorney, with whom were *Michael L. Regan*, state's attorney, and, on the brief, *Thomas M. Delillo*, senior assistant state's attorney, for the appellee (state).

*Opinion*

ZARELLA, J. This appeal arises from a peremptory challenge pursuant to which a venireperson, C.D., was excluded from the jury that found the defendant, Michael Anthony Edwards, guilty of the crime of assault of public safety personnel in violation of General Statutes § 53a-167c (a) (1).[1] During voir dire, the senior assistant state's attorney (prosecutor) asked C.D. whether there was anything that might make it difficult for her to sit in judgment of people, and C.D. responded: "Beside[s] being human, no." The prosecutor later asked C.D. why she had written "human" in response to an open-ended, optional question about race on her juror questionnaire, and she answered: "Because that is the race that I belong to." The prosecutor then exercised a peremptory challenge on the basis of C.D.'s answer to the race question. The trial court allowed the peremptory challenge and excused C.D. After a trial, the jury found the defendant guilty.

The defendant appeals from the judgment of the trial court rendered in accordance with the jury's verdict,[2] claiming that his and C.D.'s rights to equal protection were violated and that this court should exercise its supervisory authority to disallow peremptory challenges based on answers to the question about race in the juror questionnaire. In support of these claims, after the defendant filed his brief with this court, he submitted a magazine article pursuant to Practice Book § 67-10 for the purpose of bringing to the court's attention what he claimed was a pertinent and significant authority. The state argues that there was no equal protection violation because the prosecutor articulated a race neutral, nonpretextual explanation for his peremptory challenge. In addition, the state requests that we do not consider the magazine article that the defendant submitted because it was not available to the trial court and is not scientific literature. We agree with the state that we may not consider this article in our resolution of the defendant's constitutional claim and that we should not consider it in deciding the defendant's supervisory authority claim. We also agree with the state that the defendant's and C.D.'s constitutional rights were not violated and that we should not invoke our supervisory authority in the present case. Accordingly, we affirm the judgment of the trial court.

The record sets forth the following facts and procedural history. Jury selection in the present case took place July 19 through 21, 2011. Pursuant to General Statutes § 51-232 (c),[3] the juror questionnaire provides the option for a venireperson to identify his or her race and ethnicity in order to enforce nondiscrimination in jury selection. See Confidential Juror Questionnaire, Judicial Branch Form JD-JA-5a. Specifically, the juror questionnaire explains that "information concerning race and ethnicity is required solely to enforce nondis-

crimination in jury selection. The furnishing of this information is not a prerequisite to being qualified for jury service. This information need not be furnished if you find it objectionable to do so."

C.D. appeared for voir dire on the second day. C.D. indicated in the juror questionnaire that her race was "human."[4] The record does not reveal C.D.'s precise racial or ethnic background, but she appeared to be African-American or a person of color.[5]

During voir dire, the following exchange occurred:

"[The Prosecutor]: Okay. Anything in your background that would make it difficult for you to sit in judgment of other people?

"[C.D.]: Beside[s] being human, no.

"[The Prosecutor]: Okay. What is it about the fact that you're human that would make it difficult, you think?

"[C.D.]: I think that all human beings come into their court experience with unique experiences, in my particular case with more—maybe some more jury experience, but I think that having served, it has—it's convinced me of the need to withhold judgment until all facts are in. I think my experience probably biases me that way. However, in any jury deliberation, you're dealing with [a] unique mix of personalities, unique mixes of experiences, prior experiences, positive or negative, so, I think that a human coming to make a decision or judgment on any legal matter, you will probably have a mix of all of those factors.

"[The Prosecutor]: Have you—do you have any other experiences unique to you that you think might influence the work you do as a juror here?

"[C.D.]: No. I—I wouldn't think so.

"[The Prosecutor]: Okay. Anything else that I may have forgotten to ask you which leads you to believe you couldn't be fair and impartial in this case?

"[C.D.]: No, I don't think there would be anything else.

"[The Prosecutor]: One other thing. I did note on your questionnaire—and I did want to ask you about this— you indicated that when you—when you wrote down race, you wrote human. Why did you do that?

"[C.D.]: Because that is the race that I belong to.

"[The Prosecutor]: Okay. Understood."[6]

After defense counsel questioned C.D., the prosecutor exercised a peremptory challenge to strike C.D. from the jury. Defense counsel objected and requested that the prosecutor explain his reasoning because the prosecutor had posed "the same questions [to other venirepersons], and [C.D. was] the first excused by the state." Defense counsel further stated that he "didn't see [C.D.'s] answers . . . [as] significantly different [from]

anyone [else's], and [C.D.] was an African-American woman."

The prosecutor explained that he had exercised a peremptory challenge because C.D. wrote "human" as her race and the prosecutor "found that to be of concern . . . ." Specifically, the prosecutor explained that C.D.'s answer "seemed outside the norm of what one would expect to have placed in a questionnaire box, and I just found that to be disconcerting and didn't think that someone who would fill in . . . a line like that would necessarily be appropriate to serve as a juror." The prosecutor then stated that this response was "one of the reasons . . . for not selecting her." The prosecutor also noted that there had been two[7] other African-American people in the venire, one woman and one man. The African-American woman had been selected as a juror, and the African-American man was excused by the court on the basis of a conflict.

Defense counsel responded that he would "probably [have] answer[ed] [the race] question the same [way C.D. had]" because "we're all one race . . . ." In addition, defense counsel indicated that he did not think that the race question should be in the juror questionnaire at all. Finally, defense counsel emphasized that C.D.'s answer was an "appropriate response" because, "what is race, really?"

The prosecutor replied that, "for the record . . . [defense counsel] is a white male, and if he wrote 'human' on his questionnaire, if he were in front of me, in all likelihood, I would not select him as a juror either, so it has nothing to do necessarily with [the] race of the venire[person]." The prosecutor further explained that, "having picked a number of jurors in [his] lifetime, [he had] never seen [C.D.'s response] before . . . ." The prosecutor emphasized that the peremptory challenge had "nothing to do necessarily with [C.D's] race . . . [but had] to do with [her] response to the questionnaire, which struck me . . . as odd . . . ." Notably, the prosecutor's concerns were not expressly tied to the race question but, rather, were phrased as a concern about unusual responses in juror questionnaires generally.[8]

The trial court thereafter concluded: "[I]n the court's experience, [C.D.'s answer] is somewhat unusual. So, I am going to find that that's a nondiscriminatory explanation for exercising [the] peremptory challenge and overrule the objection. . . . [S]he will be excused."[9] The jury selection process resulted in six jurors and two alternates, all of whom were picked from a venire of twenty-three people. The record does not reveal how many racial minorities were on the jury, but it appears that there was at least one African-American woman.

At trial, the jury found the defendant guilty of one count of assault against public safety personnel, and

the trial court rendered judgment in accordance with the verdict. The defendant then appealed to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-2. The defendant presented for appeal the following issue: "Did the peremptory challenge against an otherwise qualified minority [venireperson] solely on the basis of her racial self-identification in the juror questionnaire deprive the defendant and the [venireperson] of their right[s] to equal protection of the law, and, in the exercise of its supervisory authority over the administration of justice, should this court disallow the use of racial self-identification in jur[or] questionnaires as a ground for a peremptory challenge?" After oral argument, and after considering the case more fully, however, we conclude that the issue presented for appeal was not properly framed. Accordingly, we rephrase the issue to conform to the issue actually presented. Cf., e.g., *State* v. *Ouellette*, 295 Conn. 173, 183–84, 989 A.2d 1048 (2010). We recast the issue as follows: "Did the prosecutor's peremptory challenge to a venireperson based on her answer to an open-ended, optional question about race in a juror questionnaire deprive the defendant and the venireperson of their rights to equal protection of the law, and should this court, in the exercise of its supervisory authority over the administration of justice, disallow the use of racial or ethnic self-identification in juror questionnaires as a ground for a peremptory challenge?"

On October 16, 2013, the defendant, pursuant to Practice Book § 67-10,[10] submitted a letter notifying this court of what he claimed was supplemental authority. The purported supplemental authority was an article from National Geographic magazine, entitled "The Changing Face of America," by Lise Funderburg.[11] See L. Funderburg, "The Changing Face of America," National Geographic, October, 2013, pp. 80–91. On October 31, 2013, the court, sua sponte, directed the parties to file simultaneous statements addressing whether the article is appropriate authority for submission pursuant to § 67-10. The defendant claimed in response that the article "is highly relevant to the constitutional and supervisory authority issues before the court in this case . . . ." The state countered that this court should not consider the article because it was not available to the trial court and is not " 'scientific literature . . . .' "[12]

With respect to the merits of this appeal, the defendant claims that the trial court improperly concluded that a peremptory challenge based on C.D.'s racial self-identification was race neutral and nondiscriminatory. The defendant argues that the prosecutor's explanation for the challenge was race based because he focused on the line of the juror questionnaire on which the potential juror is asked to indicate his or her race. The defendant further asserts that the prosecutor's explanation was pretextual because excluding venirepersons

who provide unusual answers to questions regarding racial self-identification would disproportionately affect minorities and the prosecutor's questioning regarding C.D.'s response was perfunctory. Finally, the defendant requests that this court exercise its supervisory authority to prohibit peremptory challenges based on racial self-identification in juror questionnaires and to order a new trial in the present case. The defendant argues that the invocation of our supervisory powers is appropriate because of the strong public policy against racial discrimination and because the juror questionnaire notes that the answer to this question will be used only "to enforce nondiscrimination in jury selection."

The state responds that the prosecutor's proffered explanation was race neutral because it had to do with an "unusual" response to the juror questionnaire rather than C.D.'s race. The state argues that the trial court properly found that the prosecutor's explanation was not pretextual because the defendant failed to prove any of the factors that a trial court generally considers in finding discriminatory intent. Finally, the state asserts that the invocation of our supervisory powers in the present case would be inappropriate, as *Batson* v. *Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986), and its progeny already provide adequate constitutional protection, and the perceived fairness of the judicial system as a whole is not in question.

We agree with the state that we should not consider the National Geographic article. We also agree with the state that the defendant's and C.D.'s rights to equal protection of the law were not violated, and the invocation of our supervisory powers is inappropriate in the present case. Accordingly, we affirm the judgment of the trial court.

I

We begin with the National Geographic article that the defendant submitted to this court pursuant to Practice Book § 67-10. The defendant argues that § 67-10 allows for the submission of any material that would be appropriately cited in a brief. In addition, the defendant contends that the article's contents are " 'legislative facts' " that provide background information for this court's consideration of the defendant's constitutional and supervisory authority claims. The state responds by contending, inter alia, that we should not consider the article because it was not available to, or considered by, the trial court. We agree with the state.

We doubt that this article would qualify as an "authority" under Practice Book § 67-10.[13] We need not decide this issue, however, because, with respect to the defendant's constitutional claim, we cannot consider evidence not available to the trial court to find adjudicative facts for the first time on appeal.[14] Moreover, to the extent that the defendant relies on this article in support

of his supervisory authority claim, we do not consider the article because it is irrelevant and does not contain sufficiently verifiable facts.

It is well established that this court does not find facts. E.g., *State* v. *Rizzo*, 303 Conn. 71, 97 n.16, 31 A.3d 1094 (2011), cert. denied, U.S. , 133 S. Ct. 133, 184 L. Ed. 2d 64 (2012). This court has previously distinguished between " 'legislative facts' . . . which help determine the content of law and policy, and 'adjudicative facts' . . . concerning the parties and events of a particular case." *Moore* v. *Moore*, 173 Conn. 120, 122, 376 A.2d 1085 (1977). Legislative facts "may be judicially noticed without affording the parties an opportunity to be heard," but adjudicative facts, "at least if central to the case, may not." Id.

This court has abided by this distinction. For example, in *Rizzo*, the court cautioned against using social science evidence to "second-guess" the factual findings of the three judge panel because such facts are adjudicative facts that should be presented to the trial court. *State* v. *Rizzo*, supra, 303 Conn. 180 n.76. Specifically, the court determined that it was improper for an appellate court to "rely on excerpts from social science texts or journal articles that were not recognized as authoritative by an expert and admitted into evidence during the penalty phase proceedings . . . to make factual findings regarding the defendant's state of mind for the first time on direct appeal." (Citations omitted.) Id., 97 n.16.

In the present case, whether multiracial individuals are more likely to identify in an unusual manner is a factual question. Furthermore, as we explain hereinafter, the defendant appears to suggest that the article establishes disparate impact, which courts have recognized as a factor establishing pretext in *Batson* hearings. As we noted in *Rizzo*, "it is clear that non-legal information introduced for the purpose of assessing adjudicative facts should be presented to the trial court, and not on appeal." (Internal quotation marks omitted.) Id., 98 n.16, quoting E. Margolis, "Beyond Brandeis: Exploring the Uses of Non-Legal Materials in Appellate Briefs," 34 U.S.F. L. Rev. 197, 216 (2000). Therefore, this court cannot take judicial notice of this information to second-guess the trial court's factual findings. See *State* v. *Rizzo*, supra, 303 Conn. 180 n.76. This is particularly true in the present case, in which the defendant seeks to present a magazine article to discredit the trial court's factual findings, which had been based on the court's observation of the prosecutor's demeanor and credibility. See, e.g., *State* v. *Hodge*, 248 Conn. 207, 224, 726 A.2d 531, cert. denied, 528 U.S. 969, 120 S. Ct. 409, 145 L. Ed. 2d 319 (1999). The foregoing principle protects a basic premise of our judicial system: the trial court, rather than an appellate court, finds facts.[15]

Leaving adjudicative fact-finding to the trial court results in better appellate decision making because the

trial court is best suited to evaluate the authoritativeness and reliability of a source. Although this court occasionally does take judicial notice of scientific literature, even studies that appear, at first glance, to be scientific can contain information tainted by confirmation bias or partisanship. See, e.g., J. Simmons et al., "False-Positive Psychology: Undisclosed Flexibility in Data Collection and Analysis Allows Presenting Anything as Significant," 22 Psychol. Sci. 1359, 1359 (2011) ("it is unacceptably easy to publish 'statistically significant' evidence consistent with *any* hypothesis" [emphasis in original]). For instance, "data manipulation is "common" and extends to many subjects "dependent on statistical study . . . ." C. Shea, "The Data Vigilante," The Atlantic, December, 2012, p. 34. Similarly, peer review does not necessarily guarantee that a source will be reliable. See id. ("[S]loppy statistics are like steroids in baseball . . . . Throughout the affected fields, researchers who are too intellectually honest to use these tricks will publish less, and may perish. Meanwhile, the less fastidious flourish." [Internal quotation marks omitted.]). Thus, parties must introduce adjudicative facts in the trial court, where they can be explained through expert testimony and tested through cross-examination.

For similar reasons, we do not consider the National Geographic article in our evaluation of the defendant's supervisory authority claim. Even if we assume that the article could provide the court with legislative rather than adjudicative facts with respect to this claim, we would not consider it because its contents are either anecdotal, opinion based, or unverified. The majority of the article consists of anecdotal material drawn from interviews with multiracial individuals who describe what they think about their identities. See L. Funderburg, supra, pp. 80–91. The author opines that the concept of self-identification has been changing in recent decades as the number of multiracial individuals has increased. Id., pp. 83–87. There is no conclusion based on scientific investigation, however, regarding the extent to which the concept of self-identification has changed and how, if at all, it has affected human behavior. The author also does not provide any data regarding the effect of multiracial individuals' self-identification on the juror selection process. Because the author of the article engages in conjecture on the basis of limited data, and does not engage in any sort of scientific analysis in coming to her conclusion, the contents of the article could be the result of partisanship rather than facts. From a policy perspective, the exclusion of unverifiable, opinion evidence at the appellate level will prevent more subjective decisions that may reflect the personal biases of the members of the court.

The article appears to contain only three potentially verifiable, nonanecdotal facts, none of which is supported by a citation: (1) that the United States Census

Bureau has been collecting data on multiracial persons since 2000; (2) that 6.8 million respondents identified with more than one racial category in that year; and (3) that the number of respondents identifying with more than one racial category increased 32 percent ten years later, at the time of the next census. Id., p. 83. Even if we assumed that these facts are true, they are not relevant to the defendant's supervisory authority claim because they do not establish that current practices discourage or prohibit multiracial Americans from participating in jury service. Thus, we decline to consider this article's contents in our resolution of the defendant's supervisory authority claim.

## II

We next turn to the defendant's claim that the prosecutor's peremptory challenge against C.D. deprived the defendant and C.D. of their equal protection rights. We begin our analysis with an overview of the jury selection process and the use of peremptory challenges.

"Voir dire plays a critical function in assuring the criminal defendant that his [or her] [s]ixth [a]mendment right to an impartial jury will be honored. . . . Part of the guarantee of a defendant's right to an impartial jury is an adequate voir dire to identify unqualified jurors. . . . Our constitutional and statutory law permit each party, typically through his or her attorney, to question each prospective juror individually, outside the presence of other prospective jurors, to determine [his or her] fitness to serve on the jury. Conn. Const., art. I, § 19; General Statutes § 54-82f; Practice Book [§ 42-12]. . . . Because the purpose of voir dire is to discover if there is any likelihood that some prejudice is in the [prospective] juror's mind [that] will even subconsciously affect his [or her] decision of the case, the party who may be adversely affected should be permitted [to ask] questions designed to uncover that prejudice. This is particularly true with reference to the defendant in a criminal case. . . . The purpose of voir dire is to facilitate [the] intelligent exercise of peremptory challenges and to help uncover factors that would dictate disqualification for cause. . . .

"Peremptory challenges are deeply rooted in our nation's jurisprudence and serve as one state-created means to the constitutional end of an impartial jury and a fair trial. . . . [S]uch challenges generally may be based on subjective as well as objective criteria . . . ." (Citations omitted; footnotes omitted; internal quotation marks omitted.) *State* v. *Hodge*, supra, 248 Conn. 216–17. Nevertheless, "[i]n *Batson* [v. *Kentucky*, supra, 476 U.S. 79] . . . the United States Supreme Court recognized that a claim of purposeful racial discrimination on the part of the prosecution in selecting a jury raises constitutional questions of the utmost seriousness, not only for the integrity of a particular trial but also for the perceived fairness of the judicial system as a whole.

. . . The court concluded that [a]lthough a prosecutor ordinarily is entitled to exercise permitted peremptory challenges for any reason at all, as long as that reason is related to his [or her] view concerning the outcome of the case to be tried . . . the [e]qual [p]rotection [c]lause forbids [a party] to challenge potential jurors solely on account of their race . . . .” (Footnotes omitted; internal quotation marks omitted.) *State* v. *Hodge*, supra, 218.

Under Connecticut law, a *Batson* inquiry involves three steps.[16] First, a party must assert “a *Batson* claim . . . . [Second] the [opposing party] must advance a neutral explanation for the venireperson’s removal.” (Internal quotation marks omitted.) *State* v. *Latour*, 276 Conn. 399, 408, 886 A.2d 404 (2005). “In evaluating the race neutrality of an attorney’s explanation, a court must determine whether, assuming the proffered reasons for the peremptory challenges are true, the challenges violate the [e]qual [p]rotection [c]lause as a matter of law.” *Hernandez* v. *New York*, 500 U.S. 352, 359, 111 S. Ct. 1859, 114 L. Ed. 2d 395 (1991). At this stage, the court does not evaluate the persuasiveness or plausibility of the proffered explanation but, rather, determines only its “facial validity”—that is, whether the reason on its face, is “based on something other than the race of the juror.” Id., 360; see also *Purkett* v. *Elem*, 514 U.S. 765, 767–68, 115 S. Ct. 1769, 131 L. Ed. 2d 834 (1995) (“[t]he second step . . . does not demand an explanation that is persuasive, or even plausible”); *State* v. *Hodge*, supra, 248 Conn. 219 n.18 (same). “Thus, even if the [s]tate produces only a frivolous or utterly nonsensical justification for its strike, the case does not end—it merely proceeds to step three.” *Johnson* v. *California*, 545 U.S. 162, 171, 125 S. Ct. 2410, 162 L. Ed. 2d 129 (2005).

In the third step, the burden shifts to the party asserting the *Batson* objection “to demonstrate that the [opposing party’s] articulated reasons are insufficient or pretextual.” (Internal quotation marks omitted.) *State* v. *Latour*, supra, 276 Conn. 408. In evaluating pretext, the court must assess the persuasiveness of the proffered explanation and whether the party exercising the challenge was, in fact, motivated by race. See, e.g., id., 409–10. Thus, although an improbable explanation might pass muster under the second step, “implausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination” at the third stage of the inquiry. (Internal quotation marks omitted.) *State* v. *Hodge*, supra, 248 Conn. 219 n.18, quoting *Purkett* v. *Elem*, supra, 514 U.S. 768.

“We have identified several specific factors that may indicate that [a party’s removal] of a venireperson through a peremptory challenge was . . . motivated [by race]. These include, but are not limited to: (1) [t]he reasons given for the challenge were not related to

the trial of the case . . . (2) the [party exercising the peremptory strike] failed to question the challenged juror or only questioned him or her in a perfunctory manner . . . (3) prospective jurors of one race . . . were asked a question to elicit a particular response that was not asked of other jurors . . . (4) persons with the same or similar characteristics but not the same race . . . as the challenged juror were not struck . . . (5) the [party exercising the peremptory strike] advanced an explanation based on a group bias where the group trait is not shown to apply to the challenged juror specifically . . . and (6) the [party exercising the peremptory strike] used a disproportionate number of peremptory challenges to exclude members of one race . . . .'' (Internal quotation marks omitted.) *State* v. *Latour*, supra, 276 Conn. 409.

''In deciding the ultimate issue of discriminatory intent, the [court] is entitled to assess each explanation in light of all the other evidence relevant to [a party's] intent. The [court] may think a dubious explanation undermines the bona fides of other explanations or may think that the sound explanations dispel the doubt raised by a questionable one. As with most inquiries into state of mind, the ultimate determination depends on an aggregate assessment of all the circumstances.'' (Internal quotation marks omitted.) Id., 409–10. Ultimately, the party asserting the *Batson* claim ''carries the . . . burden of persuading the trial court, by a preponderance of the evidence, that the jury selection process in his or her particular case was tainted by purposeful discrimination.'' (Internal quotation marks omitted.) Id., 409.

This court previously has articulated the standard of review applicable to *Batson* claims without differentiating between the second and third analytical steps, or, at the very least, has not specifically stated the standard applicable to a trial court's determination with respect to the second step.[17] We take this opportunity to clarify the standard of review for *Batson* claims. The second step of the *Batson* inquiry involves a determination of whether the party's proffered explanation is facially race neutral and, thus, is a question of law. See, e.g., *Hernandez* v. *New York*, supra, 500 U.S. 359 (''[i]n evaluating the race neutrality of an attorney's explanation, a court must determine whether, *assuming the proffered reasons for the peremptory challenges are true*, the challenges violate the [e]qual [p]rotection [c]lause *as a matter of law*'' [emphasis added]); *State* v. *Hinton*, 227 Conn. 301, 324, 630 A.2d 593 (1993) (same). Because this inquiry involves a matter of law, we exercise plenary review.[18] See *State* v. *Hodge*, supra, 248 Conn. 289 (*Berdon, J.*, dissenting).

The third *Batson* step, however, requires the court to determine if the prosecutor's proffered race neutral explanation is pretextual. See, e.g., *Hernandez* v. *New*

*York*, supra, 500 U.S. 364–65. "Deference [to the trial court's findings of credibility] is necessary because a reviewing court, which analyzes only the transcripts from voir dire, is not as well positioned as the trial court is to make credibility determinations." *Miller-El* v. *Cockrell*, 537 U.S. 322, 339, 123 S. Ct. 1029, 154 L. Ed. 2d 931 (2003). Whether pretext exists is a factual question, and, therefore, we shall not disturb the trial court's finding unless it is clearly erroneous. See, e.g., *Hernandez* v. *New York*, supra, 364 ("[i]n *Batson*, we explained that the trial court's decision on the ultimate question of discriminatory intent represents a finding of fact of the sort accorded great deference on appeal").

A

It is uncontested that the defense raised a *Batson* claim with respect to the prosecutor's peremptory challenge to C.D., and, thus, we begin our inquiry with the second step to determine whether the prosecutor's proffered explanation was race neutral. The defendant claims that the prosecutor's peremptory challenge was not race neutral because the peremptory challenge was based solely on C.D.'s racial self-identification in the juror questionnaire. The defendant also argues that an " 'unusual' " racial identification is a proxy for race, and, thus, the court should find discriminatory intent inherent in the prosecutor's explanation. The state counters that the prosecutor's proffered explanation was race neutral because it was based not on C.D.'s race but, rather, on the unusual manner in which she answered a question about race in the juror questionnaire. We agree with the state.

We are guided in our analysis of this claim by *Hernandez* v. *New York*, supra, 500 U.S. 352. In *Hernandez*, the petitioner, Dionisio Hernandez, objected to the district attorney's use of peremptory challenges to strike four potential Latino jurors in a trial involving testimony in Spanish and the use of an interpreter to translate from Spanish to English. See id., 355–57. The district attorney's proffered race neutral explanation for excluding these potential jurors was that they were bilingual and that he felt "very uncertain that they would be able to listen [to] and follow the interpreter" as opposed to adhering to their own understanding of the testimony. (Internal quotation marks omitted.) Id., 356. Hernandez claimed that "Spanish-language ability bears a close relation to ethnicity, and that, as a consequence, it violates the [e]qual [p]rotection [c]lause to exercise a peremptory challenge on the ground that a . . . potential [Latino] juror speaks Spanish." Id., 360.

The court concluded that the peremptory challenges "rested neither on the intention to exclude Latino or bilingual jurors, nor on stereotypical assumptions about Latinos or bilinguals. The [district attorney's] articulated basis for these challenges divided potential jurors into two classes: those whose conduct during voir dire

would persuade him they might have difficulty in accepting the translator's rendition of Spanish-language testimony and those potential jurors who gave no such reason for doubt. Each category would include both Latinos and non-Latinos." Id., 361. The court also clarified that "disparate impact should be given appropriate weight in determining whether [a] prosecutor acted with a forbidden intent, but it will not be conclusive in the preliminary race-neutrality step of the *Batson* inquiry." Id., 362; see also *State* v. *Hinton*, supra, 227 Conn. 328–31 (finding prosecutor's explanation race neutral when prosecutor stated that excluded jurors lived in close proximity to crime scene, which might lead to disparate impact on minority racial groups).

In the present case, the prosecutor's explanation that C.D.'s answer was "unusual" is facially race neutral. This explanation would divide venirepersons into two potential categories: (1) those who answered the questionnaire in a normal or usual way; and (2) those who, like C.D., answered the questionnaire with an unusual response that the prosecutor and court had not seen before. Each of these categories could include, or not include, racial minorities. Further, the prosecutor did not explicitly mention race in his explanation; rather, he brought up race only in response to the *Batson* claim. Specifically, the prosecutor stated that the peremptory challenge had "nothing to do necessarily with [C.D.'s] race . . . [but had] to do with [her] response to the questionnaire, which struck [him] as odd . . . ."

The defendant posits that a racial minority is more likely to identify himself or herself as an "unusual" race, and, thus, the prosecutor's proffered reason is inherently discriminatory. This argument is, in essence, a disparate impact argument, which is not dispositive of the issue of race neutrality. See *Hernandez* v. *New York*, supra, 500 U.S. 361. The discriminatory nature of the explanation must be clear on its face in order for the explanation to be inherently discriminatory. In addition, to the degree to which we will consider disparate impact at this stage, the disparate impact must be clear from the party's proffered explanation. In the present case, the prosecutor explained that he was concerned about an "unusual" response to a question in the juror questionnaire. He did not tie his concerns to the race question specifically but, rather, stated that C.D.'s response raised a "red flag," which was based on his years of experience in selecting juries. The defendant does not assert that minorities will answer *every* question in a potentially unusual manner, and, thus, even if we were to assume that more racial minorities will identify in an unusual manner, we still would not find that the prosecutor's explanation was inherently discriminatory.

Defense counsel also asserted that "we're all one race," thus implying that the prosecutor's explanation

was inherently discriminatory against those identifying with the human race. We note that the purpose behind *Batson* is to protect cognizable groups that historically have been excluded from juries. See, e.g., *J.E.B.* v. *Alabama ex rel. T.B.*, 511 U.S. 127, 136, 114 S. Ct. 1419, 128 L. Ed. 2d 89 (1994) ("[c]ertainly, with respect to jury service, African-Americans . . . share a history of total exclusion"); *Batson* v. *Kentucky*, supra, 476 U.S. 85 ("[e]xclusion of black citizens from service as jurors constitutes a primary example of the evil the [f]ourteenth [a]mendment was designed to cure"). Within other contexts, the United States Supreme Court has expanded the definition of "race" to include "identifiable classes of persons who are subjected to intentional discrimination solely because of their ancestry or ethnic characteristics." *Saint Francis College* v. *Al-Khazraji*, 481 U.S. 604, 613, 107 S. Ct. 2022, 95 L. Ed. 2d 582 (1987) (discussing racial discrimination within context of 42 U.S.C. § 1981). The specific race with which C.D. identified, however, would encompass all persons, regardless of their physical characteristics, ancestry or ethnicity.[19] Thus, the use of a peremptory challenge against an individual who identifies as being part of the human race cannot logically be facially race based.

## B

Now that we have concluded that the prosecutor's explanation was race neutral, we turn to *Batson*'s third step to determine whether that explanation was pretextual.[20] The trial court made factual findings in the present case that C.D.'s answer was "somewhat of an unusual response"[21] and that the prosecutor's explanation was nondiscriminatory. The defendant claims that the prosecutor's explanation was pretextual because it focused exclusively on the "race" question in the juror questionnaire and C.D. was African-American or a person of color. The state responds that the defendant has not established even one of the factors that this court generally considers in determining that a party's explanation for a peremptory challenge is pretextual. We agree with the state that the defendant has not demonstrated that the trial court's findings were clearly erroneous. Although the factors that courts normally consider in determining pretext are not conclusive, the defendant's failure to establish any of these factors—or to suggest any alternative grounds—gives us no reason to second-guess the trial court's findings. Thus, although a peremptory challenge based on an "unusual" answer to the race question might, in some circumstances, be pretextual, we agree with the state that the trial court did not improperly find a lack of discriminatory intent in the present case.

First, the defendant contends that the prosecutor's explanation was "vague" and had nothing to do with the present case. In support of this contention, the defendant argues that the prosecutor failed to note any-

thing else in voir dire that he found disconcerting. To the contrary, however, the prosecutor did explain what made C.D.'s answer disconcerting: it was "unusual" and "outside the norm of what one would expect . . . ."[22] A party is within his or her right to seek to exclude jurors on the basis of unusual responses because such responses might demonstrate, for example, the existence of certain beliefs[23] or an inability to follow instructions.[24] In the present case, C.D. previously had indicated that being "human" might make it difficult for her to be impartial.[25] The record thus supports the prosecutor's concern, as potential partiality would clearly have an effect on the trial.

Furthermore, the prosecutor did not question C.D. in a perfunctory manner. Rather, the prosecutor asked C.D. a variety of questions to determine her general suitability, and he already had asked her to explain what she meant by being "human" in the context of sitting in judgment of others. There is no evidence that the prosecutor questioned C.D. or other venirepersons who were racial minorities any differently from other venirepersons. Moreover, the defendant has not suggested any sort of group bias regarding C.D.'s race on which the prosecutor might have based his challenge.

There also is no evidence of a pattern of discrimination or disparate treatment in the prosecutor's exercise of peremptory challenges. There were twenty-three venirepersons, six of whom were selected to serve on the jury and two of whom were selected as alternate jurors. It is unclear how many of the selected jurors were racial minorities, but the record reveals that at least one was African-American. There also is no evidence that other, nonminority jurors answered the juror questionnaire in an unusual way or were treated differently. The defendant has provided no further information regarding any alleged pattern of discrimination, and, thus, we shall not disturb the trial court's finding that "there certainly [was] no pattern established at all."

Finally, there is insufficient evidence to find any sort of disparate impact from the prosecutor's proffered explanation.[26] The defendant cites to a variety of social science studies for the proposition that a racial minority is more likely to give an unusual answer to a racial identification question. We are limited in our consideration of these sources, however, because they were not available to the trial court when it made its factual determination and do not constitute scientific literature. Regardless, even if we accepted the facts in these sources as true, the defendant has proven only that racial minorities are more likely to self-identify in creative and unusual ways, not that these same individuals would write an unusual answer in an official document. Furthermore, the prosecutor's proffered explanation related to unusual answers in the questionnaire generally, not to the race line specifically. Thus, the prosecu-

tor's explanation would affect not just jurors who wrote unusual responses to the race question but also jurors who wrote unusual answers to other questions such as those seeking the prospective juror's address or occupation.[27]

To be sure, a policy of excluding all individuals who provide an answer other than the usual answer to the question of race, i.e., "Caucasian," "African-American," or other well-known races, "without regard to the particular circumstances of the trial or the individual responses of the [potential] jurors, may be found by the trial [court] to be a pretext for racial discrimination." *Hernandez* v. *New York*, supra, 500 U.S. 372. That is not the case before us, however. We therefore determine that the trial court's finding of a lack of discriminatory intent was not clearly erroneous.

III

The defendant also requests that this court exercise its supervisory authority to prohibit peremptory challenges based on a venireperson's response to the optional race question in the juror questionnaire. We decline to exercise our supervisory authority to create such a rule.

Supervisory authority is an extraordinary remedy that should be used "sparingly . . . ." (Citation omitted.) *State* v. *Rose*, 305 Conn. 594, 607, 46 A.3d 146 (2012). "Although [a]ppellate courts possess an inherent supervisory authority over the administration of justice . . . [that] authority . . . is not a form of free-floating justice, untethered to legal principle. . . . Our supervisory powers are not a last bastion of hope for every untenable appeal. They are an *extraordinary* remedy to be invoked only when circumstances are such that the issue at hand, while not rising to the level of a constitutional violation, is nonetheless of utmost seriousness, not only for the integrity of a particular trial but also for the perceived fairness of the judicial system as a whole. . . . Constitutional, statutory and procedural limitations are generally adequate to protect the rights of the defendant and the integrity of the judicial system. Our supervisory powers are invoked only in the rare circumstance [in which] these traditional protections are inadequate to ensure the fair and just administration of the courts." (Emphasis in original; internal quotation marks omitted.) *State* v. *Wade*, 297 Conn. 262, 296, 998 A.2d 1114 (2010). Overall, "the integrity of the judicial system serves as a unifying principle behind the seemingly disparate use of our supervisory powers." *State* v. *Anderson*, 255 Conn. 425, 439, 773 A.2d 287 (2001). Thus, we are more likely to invoke our supervisory powers when there is a "pervasive and significant problem"; *State* v. *Hill*, 307 Conn. 689, 706, 59 A.3d 196 (2013); or when the conduct or violation at issue is "offensive to the sound administration of justice . . . ." *State* v. *Colon*, 272 Conn. 106, 239, 864

A.2d 666 (2004), cert. denied, 546 U.S. 848, 126 S. Ct. 102, 163 L. Ed. 2d 116 (2005).

In the present case, the record and our independent research do not indicate that improper peremptory challenges based on the optional race question are a "pervasive and significant problem." *State* v. *Hill*, supra, 307 Conn. 706. The defendant urges us to respond to the "changing population in Connecticut and the need to encourage all people to participate in our democratic institutions." The defendant presents no evidence, however, that our current practices result in fewer racial minorities participating in the jury selection process.[28] First, the legislature specifically has noted the importance of the optional race question in the juror questionnaire "to enforce nondiscrimination in jury selection . . . ."[29] General Statutes § 51-232 (c). Second, the juror questionnaire provides all individuals with the option not to answer the race question if they find it "objectionable" to furnish such information. Third, our decision should not be construed to limit how an individual can identify his or her race in the juror questionnaire. An individual will still be free to list "human" as his or her race. We merely conclude that a peremptory challenge based on such an unusual answer is race neutral under the circumstances of the present case and that a trial court in a future case may or may not find pretext, depending on the particular facts of the case. Finally, we note that a peremptory challenge based on a venireperson's offensive or ridiculous answer to the race question might in fact further the interests of justice. As the defendant himself acknowledges in his brief, an answer such as "Aryan" might indeed signal that the venireperson likely would be "unable impartially to consider the state's case against [an African-American] defendant." We therefore decline to invoke our supervisory powers to create a rule preventing parties from exercising peremptory challenges based on answers to the race question in the juror questionnaire.

The judgment is affirmed.

In this opinion EVELEIGH and ESPINOSA, Js., concurred.

[1] General Statutes § 53a-167c (a) provides in relevant part: "A person is guilty of assault of public safety . . . personnel when, with intent to prevent a reasonably identifiable . . . employee of the Department of Correction . . . from performing his or her duties, and while such . . . employee . . . is acting in the performance of his or her duties, (1) such person causes physical injury to such . . . employee . . . ."

Although § 53a-167c (a) was amended in 2011 and 2013; see Public Acts 2013, No. 13-111, § 1; Public Acts 2011, No. 11-175, § 4; those amendments have no bearing on the merits of this appeal. In the interest of simplicity, we refer to the current revision of § 53a-167c.

[2] The defendant was sentenced to a term of nine years incarceration, to be served consecutively to the fifty year sentence that the defendant already was serving for another conviction. The defendant has not challenged the sufficiency of the evidence to sustain his conviction of assault of public safety personnel.

[3] General Statutes § 51-232 (c) provides in relevant part: "The Jury Administrator shall send to a prospective juror a juror confirmation form and a confidential juror questionnaire. Such questionnaire shall include questions

eliciting the juror's name, age, race and ethnicity, occupation, education and information usually raised in voir dire examination. The questionnaire shall inform the prospective juror that information concerning race and ethnicity is required solely to enforce nondiscrimination in jury selection, that the furnishing of such information is not a prerequisite to being qualified for jury service and that such information need not be furnished if the prospective juror finds it objectionable to do so. Such juror confirmation form and confidential juror questionnaire shall be signed by the prospective juror under penalty of false statement. . . ."

[4] After voir dire, the wrong questionnaire was marked as court exhibit 1, and C.D.'s questionnaire was lost. On June 8, 2012, the defendant filed a motion for rectification of the record to reflect the facts that (1) the defendant is African-American, (2) C.D. "appeared to be African-American," (3) the wrong juror questionnaire was marked as court exhibit 1, and C.D. had written "human" on the line designated for race in the questionnaire. The Appellate Court granted the defendant's motion on July 13, 2012.

[5] Although C.D.'s precise racial and ethnic background is unclear from the record, the court and the parties treated C.D. as being a racial minority for purposes of determining whether there was a constitutional violation. Therefore, we similarly treat her as a racial minority for purposes of our equal protection analysis.

[6] C.D. also referred to being "human" at another point during voir dire prior to this exchange. When the prosecutor asked C.D. whether she had any opinions about correction officers, C.D. responded: "No. [Correction] officers are all unique individuals." When the prosecutor asked her to explain, C.D. stated: "Because they're human . . . and humans are all unique."

[7] There is some inconsistency in the record regarding how many African-American people were part of the venire. The number appears to be somewhere between two and four.

[8] In response to the prosecutor's explanation, defense counsel noted: "Just for . . . the record, my son and I were talking about this the other day, and he thought that it would be an incredible art exhibit to take the whitest of white persons, and take the blackest of black persons, and have them in the Guggenheim Museum in New York and up the spiral staircase, and have the shades slowly but surely [come] into the middle, and then have a—one question, you decide, where do you draw the line. So, we really are one human race, Your Honor. I don't think it's that odd of a response."

[9] The trial court specifically concluded: "All right. Well, obviously, the [defense] has raised a . . . challenge [under *Batson* v. *Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986)], [to] the [prosecutor's] exercise of [his] peremptory challenge. As I understand it, since [the defense] has raised the objection, certainly, that triggers the requirement that the party exercising the challenge, in this case the [prosecutor], respond with a nondiscriminatory reason for excusing the prospective juror, and, as the court analyzes this, some of the factors that the court should consider would be . . . whether there was a pattern of exclusion of all jurors of the same race, and, certainly, that's one of the factors that the court can consider.

"In this case, there certainly is no pattern established at all. As the prosecutor has pointed out, the previous jurors who have been—well, one juror who was actually selected in this case, and then another who was excused for a different reason, would not support the existence of any kind of a pattern. I'm just looking at some of the other factors.

"Well, it's—the court is going to conclude that, based on the court's experience, it is—it is somewhat of an unusual response to that question. Whether or not that should be on the questionnaire . . . as [defense counsel] points out, it is on the questionnaire, it is asked . . . and we will certainly make the questionnaire a court exhibit in this case, but, in fact, as the prosecutor points out, [C.D.] did write that on the form, and, in the court's experience, that is somewhat unusual. So, I am going to find that that's a nondiscriminatory explanation for exercising that peremptory challenge and overrule the objection. All right? So, she will be excused."

[10] Practice Book § 67-10 provides in relevant part: "When *pertinent and significant authorities* come to the attention of a party after the party's brief has been filed, or after oral argument but before decision, a party may promptly advise the appellate clerk of such supplemental authorities, by letter, with a copy certified to all counsel of record in accordance with Section 62-7. . . . The letter shall set forth the citations of the authorities. . . . The letter shall concisely and without argument state the relevance of the supplemental citations and shall include, where applicable, reference

to the pertinent page(s) of the brief. . . .” (Emphasis added.)

[11] The author of the article suggests that traditional racial categories are breaking down and that an increasing number of individuals are identifying themselves as belonging to more than one category. L. Funderburg, “The Changing Face of America,” National Geographic, October, 2013, pp. 83–87. In support of this conclusion, the author states that, since 2000, when the United States Census Bureau began collecting data on multiracial respondents by allowing them to indicate that they belonged to more than one race, the number of individuals identifying themselves as multiracial has jumped 32 percent from the 6.8 million reported that year. Id., p. 83. The author also opines that “people with complex cultural and racial origins [have] become more fluid and playful with what they call themselves”; id., pp. 83–87; and cites anecdotal evidence in support of this view. See id., p. 87.

[12] The concurrence states that our decision not to consider the article occurs “on our own motion . . . .” Footnote 7 of the concurring opinion. First, our consideration of this issue occurs as the result of a sua sponte directive from this court, not a motion. Moreover, although the state did not file an opposition to the defendant’s letter, the state did contest the court’s consideration of the article following the court’s directive.

The concurrence also asserts that the state “did not object to any of the articles or studies cited by the defendant” in his brief and “simply ignored them, essentially treating them as irrelevant . . . .” The state did, however, address in its brief the defendant’s use of social science articles. For instance, the state acknowledged that the defendant “relies on sociology based theories that indicate that persons of mixed racial backgrounds sometimes choose not to identify with any one particular race but describe their identities in ways that transcend race, by using terms like ‘human’ or ‘American.’ ” The state then counters the defendant’s reliance on these articles by noting that “the defendant assumes facts that are not part of the record in this appeal. It is sheer speculation that C.D. is mixed or multiracial or that she wrote ‘human’ in response to the race question [in] the juror [questionnaire] because she is a mixed or multiracial person who embraces a nonracial or transcendent identity. . . . In fact, the record before this court actually supports an inference that C.D. wrote ‘human’ in response to the question about race [in] the juror questionnaire . . . not because she identified as a mixed or multiracial person but because, regardless of her race, she is a humanist or simply eschews racial classification altogether.” (Citations omitted.)

[13] Although the rules of practice do not define “supplemental authorities,” the only specific example within Practice Book § 67-10 of such authority is an unreported judicial decision. In addition, the rules of practice and Rules of Professional Conduct consistently use the word “authorities” to refer to legal authorities. See, e.g., Practice Book § 10-39 (c) (“[e]ach motion to strike must be accompanied by a memorandum of law citing the *legal authorities* upon which the motion relies” [emphasis added]); Practice Book § 34a-17 (a) (“[e]ach motion to strike must be accompanied by an appropriate memorandum of law citing the *legal authorities* upon which the motion relies” [emphasis added]); Rules of Professional Conduct 3.3, commentary (“[a] lawyer . . . must recognize the existence of *pertinent legal authorities*” [emphasis added]). Finally, the rules of practice refer to a “table of authorities” in appellate briefs and set forth guidelines for the citation of cases but not for other types of writings. See Practice Book § 67-11; see also Practice Book § 67-4 (b) (“A table of authorities cited in the brief, with references to the page or pages of the brief where the citations to those authorities appear. Citations shall be in the form provided in Section 67-11.”); Practice Book § 67-5 (b) (same). Although Practice Book § 67-10 uses the broader term “authorities” rather than “legal authorities,” it seems clear that an authority must hold some sort of precedential weight or, at the very least, contain verifiable information.

Dictionary definitions of “authority” support this interpretation. Black’s Law Dictionary defines “authority” within this context as “[a] legal writing taken as definitive or decisive; esp[ecially], a judicial or administrative decision cited as a precedent . . . . The term includes not only the decisions of tribunals but also statutes, ordinances, and administrative rulings.” Black’s Law Dictionary (9th Ed. 2009) p. 153; see also Merriam Webster’s Collegiate Dictionary (11th Ed. 2003) p. 83 (defining “authority” as “a conclusive statement or set of statements [as an official decision of a court]” or “a decision taken as a precedent” or “testimony”). Black’s Law Dictionary further differentiates between primary and secondary authority, defining the latter as “[a]uthority that explains the law but does not itself establish it, such as a

treatise, annotation, or law-review article." Black's Law Dictionary, supra, p. 153. The National Geographic article thus probably would not qualify as an "authority" because it certainly is not legal authority, as it is not a judicial or administrative decision; nor is it a treatise, annotation or law review article.

[14] The concurrence agrees with the defendant that "[a]nything [that] would be appropriate to cite in [a party's] brief is appropriate to bring to the court's attention [pursuant to] Practice Book § 67-10." (Internal quotation marks omitted.) Even if this were true, it still would be inappropriate for this court to consider the National Geographic article in the context of deciding the defendant's constitutional claim because, as we explain hereinafter, the information therein constitutes adjudicative facts that were not presented to the trial court.

[15] The concurrence claims that, "because the prosecutor's explanation for striking C.D. as a juror was not based on the 'fact' that her response to the juror questionnaire was odd or unusual but on the prosecutor's belief, in light of his own experience, that the response was odd, it is not unfair for the defendant to use similar evidence to support his contention that the response was *not* odd or unusual." (Emphasis in original.) The prosecutor's belief and experience, however, are a part of the trial court's factual findings regarding the prosecutor's intent in a *Batson* hearing, and, thus, they are adjudicative facts. See *State* v. *Hodge*, supra, 248 Conn. 224 ("[T]he trial court's decision on the question of discriminatory intent represents a finding of fact that will necessarily turn on the court's evaluation of the demeanor and credibility of the attorney of the party exercising the peremptory challenge. . . . Accordingly, a trial court's determination that there has or has not been intentional discrimination is afforded great deference and will not be disturbed unless it is clearly erroneous." [Citations omitted.]). Therefore, the defendant should have submitted any evidence of this nature at the *Batson* hearing.

The concurrence suggests that it would place counsel in an "untenable position" to require that he or she submit this evidence at the *Batson* hearing. Text accompanying footnote 10 of the concurring opinion. Specifically, the concurrence asserts that "counsel cannot possibly be expected to anticipate and prepare for any number of idiosyncratic responses by any number of venirepersons, or for the limitless number of reasons why opposing counsel might wish to exercise a peremptory challenge to strike any one or more of those venirepersons." We do not see any reason, however, why a *Batson* hearing would be different from any number of other hearings throughout the trial process that require counsel to do exactly that. Thus, if defense counsel wished to introduce evidence to support his *Batson* claim, he should have done so at the *Batson* hearing. See *Watkins* v. *Texas*, 245 S.W.3d 444, 455–56 (Tex. Crim. App.) ("The [defendant] urges us to consider the results of a study commissioned by the Dallas Morning News that he contends shows a continuing pattern on Dallas County's part of exercising peremptory challenges in a racially discriminatory manner. . . . We do not think the court of appeals abused its discretion in refusing to judicially notice the Dallas Morning News study on appeal. To do so would have put the [s]tate at a distinct disadvantage in our adversarial system, because . . . the [s]tate would have been given no opportunity to challenge the integrity or provenance of the study, as it could have done *had the study been presented for judicial notice at the Batson hearing.*" [Emphasis added; footnotes omitted.]), cert. denied, 555 U.S. 846, 129 S. Ct. 92, 172 L. Ed. 2d 78 (2008); see also *Gray* v. *Maryland*, 317 Md. 250, 257, 562 A.2d 1278 (1989) (explaining that trial court generally has "broad discretion" to determine whether cross-examination of prosecutor will occur at *Batson* hearing); *Ohio* v. *Powers*, 92 Ohio App. 3d 400, 410, 635 N.E.2d 1298 (1993) (noting that there is no *per se* rule against admission of expert testimony at *Batson* hearing), cert. denied, 513 U.S. 951, 115 S. Ct. 366, 130 L. Ed. 2d 319 (1994).

[16] We note that a *Batson* inquiry under Connecticut law is different from most federal and state *Batson* inquiries. "Under federal law, a three step procedure is followed when a *Batson* violation is claimed: (1) the party objecting to the exercise of the peremptory challenge must establish a prima facie case of discrimination; (2) the party exercising the challenge then must offer a neutral explanation for its use; and (3) the party opposing the peremptory challenge must prove that the challenge was the product of purposeful discrimination. . . . Pursuant to this court's supervisory authority over the administration of justice, we have eliminated the requirement, contained in the first step of this process, that the party objecting to the exercise of the peremptory challenge establish a prima facie case of discrimination. *State* v. *Holloway*, 209 Conn. 636, 646 [and] n.4, 553 A.2d 166, cert. denied, 490 U.S. 1071, 109 S. Ct. 2078, 104 L. Ed. 2d 643 (1989)." (Citations omitted; internal quotation marks omitted.) *State* v. *King*, 249 Conn. 645,

658 n.18, 735 A.2d 267 (1999).

[17] This court has specifically referred to the standard of review applicable to a trial court's determination only with respect to the third step, which requires a factual inquiry into the existence of discriminatory intent: "Finally, the trial court's decision on the question of discriminatory intent represents a finding of fact that will necessarily turn on the court's evaluation of the demeanor and credibility of the attorney of the party exercising the peremptory challenge. . . . Accordingly, a trial court's determination that there has or has not been intentional discrimination is afforded great deference and will not be disturbed unless it is clearly erroneous. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) *State* v. *Latour*, supra, 276 Conn. 410.

[18] This standard of review is consistent with the United States Supreme Court's admonition against conflating the various steps of a *Batson* inquiry. In *Purkett*, the United States Supreme Court admonished the Eighth Circuit Court of Appeals for "combining *Batson*'s second and third steps into one, requiring that the justification tendered at the second step be not just neutral but also at least minimally persuasive, i.e., a plausible basis for believing that the person's ability to perform his or her duties as a juror will be affected." (Internal quotation marks omitted.) *Purkett* v. *Elem*, supra, 514 U.S. 768. The court emphasized that "[i]t is not until the *third* step that the persuasiveness of the justification becomes relevant—the step [at] which the trial court determines whether the opponent of the strike has carried his burden of proving purposeful discrimination." (Emphasis in original.) Id. Because the third step involves a factual determination and the second step does not, we should treat the standard of review for each step differently.

Our research reveals that this standard of review is in accord with most federal circuit courts of appeals that have examined this issue. See, e.g., *Stubbs* v. *Gomez*, 189 F.3d 1099, 1105 (9th Cir. 1999) ("[w]e review de novo a district court's holding that a prosecutor's proffered reason for a peremptory challenge is race-neutral"), cert. denied sub nom. *Stubbs* v. *Terhune*, 531 U.S. 832, 121 S. Ct. 88, 148 L. Ed. 2d 49 (2000); *United States* v. *Uwaezhoke*, 995 F.2d 388, 392 (3d Cir. 1993) ("if the government's explanation does not, on its face, discriminate on the basis of race, then we must find that the explanation passes *Batson* muster as a matter of law"), cert. denied, 510 U.S. 1091, 114 S. Ct. 920, 127 L. Ed. 2d 214 (1994); *United States* v. *Johnson*, 941 F.2d 1102, 1108 (10th Cir. 1991) ("we analyze the prosecutor's explanation for his actions as a legal issue"). The Eleventh Circuit, like this court, previously has not specifically articulated the standard of review for the second step. See, e.g., *United States* v. *Stewart*, 65 F.3d 918, 923 (11th Cir. 1995) ("[o]nce past the prima facie step, the [D]istrict [C]ourt's determination concerning the actual motivation behind each challenged strike amounts to pure factfinding"), cert. denied sub nom. *Daniel* v. *United States*, 516 U.S. 1134, 116 S. Ct. 958, 133 L. Ed. 2d 881 (1996).

State courts that explicitly have addressed this issue also have found that review of a trial court's determination with respect to the second step is a question of law. See, e.g., *Frazier* v. *State*, 899 So. 2d 1169, 1173 (Fla. App. 2005) ("federal courts consider the facial validity of an explanation to be a question of law and thus review the trial court's ruling on this issue de novo"); *People* v. *Knight*, 473 Mich. 324, 343, 701 N.W.2d 715 ("we believe that those jurisdictions that have concluded that the second step is subject to review de novo have the better view . . . [because] such an approach is consistent with controlling United States Supreme Court precedent" [citations omitted]), cert. denied sub nom. *Rice* v. *Michigan*, 546 U.S. 1043, 126 S. Ct. 759, 163 L. Ed. 2d 590 (2005); *State* v. *Thorpe*, 280 Neb. 11, 17, 783 N.W.2d 749 (2010) ("[f]or *Batson* challenges, we will review de novo the facial validity of an attorney's race-neutral explanation for using a peremptory challenge as a question of law"); *Moeller* v. *Blanc*, 276 S.W.3d 656, 660 (Tex. App. 2008) ("At the second step of the [*Batson*] analysis . . . there is no fact-finding to be done. The trial court simply accepts the explanation for the strike at face value and determines whether it is a reasonably specific race-neutral reason. Accordingly, the second step presents a legal question . . . ."), review denied, Texas Supreme Court, Docket No. 09-0285 (Tex. August 21, 2009).

Many courts, like this court and the Eleventh Circuit Court of Appeals, either have not differentiated between the second and third steps or have not specifically articulated a standard of review for the second step. See, e.g., *State* v. *Adams*, 269 Kan. 681, 687–88, 8 P.3d 724 (2000) ("It is important

to emphasize . . . the district judge's authority to reject pretextual race-neutral justifications in executing the *third step* of the *Batson* test. . . . Because the district judge's findings . . . will turn [largely] on evaluation of the credibility of the prosecutor's explanation, we ordinarily accord [those] findings great deference." [Citations omitted; emphasis added.]); *State* v. *Elie*, 936 So. 2d 791, 800 (La. 2006) ("If the race-neutral explanation is tendered, the trial court must decide, in step three of the *Batson* analysis, whether the defendant has proven purposeful discrimination. . . . A reviewing court owes the district judge's evaluation of discriminatory intent great deference and should not reverse them unless they are clearly erroneous." [Citation omitted.]); *Khan* v. *State*, 213 Md. App. 554, 571, 74 A.3d 844 (2013) ("we do not see clear error in the court's finding that this particular explanation was pretextual and that purposeful discrimination had occurred"); *State* v. *Antwine*, 743 S.W.2d 51, 66 (Mo. 1987) ("[a] finding of discrimination, or a finding of no discrimination, is a finding of fact"), cert. denied, 486 U.S. 1017, 108 S. Ct. 1755, 100 L. Ed. 2d 217 (1988).

Our research reveals only two states that explicitly have employed a different standard of review for the second step of *Batson* review. One of these states, namely, Wisconsin, had employed a clearly erroneous standard but subsequently expressed hesitation concerning the propriety of this standard. See *State* v. *King*, 215 Wis. 2d 295, 301 n.1, 572 N.W.2d 530 (App. 1997) ("[The defendant] argues that the deferential standard is incorrect with respect to the second *Batson* step, that our ruling on this point in *State* v. *Lopez*, 173 Wis. 2d 724, 729, 486 N.W.2d [617 (App. 1992)], was dict[um], and that we should use a de novo standard [of review with respect to] the second step. The reason we decided in *Lopez* to employ the 'clearly erroneous' standard at each step in the *Batson* analysis is that the question of discriminatory intent is largely informed by the trial judge's perceptions at voir dire. . . . We acknowledge that the issue presented [in] this appeal . . . does not depend . . . on competing inferences from the evidence or the trial court perceptions and may be described as purely a question of law. However, we will not modify our decision in *Lopez* because we are bound by our published decisions and may not overrule, modify or withdraw language from them." [Citation omitted.]). The other state, Utah, employs an abuse of discretion standard. See *State* v. *Jackson*, 243 P.3d 902, 909 (Utah. App. 2010), cert. denied, 247 P.3d 774 (Utah 2011) ("[t]he second step, a determination of whether the [s]tate presented a facially neutral reason for the strike, is reviewed for an abuse of discretion").

[19] In addition, as we noted previously, it is unclear from the record whether C.D. was a racial minority at all. The record merely indicates that C.D. appeared to be African-American or a person of color. Nevertheless, we reject the defendant's arguments regarding race neutrality because it is unclear *from the face of the prosecutor's explanation* that his peremptory challenge was based on C.D.'s race, whatever her race might be.

[20] The state argues that the defendant has not preserved this issue for appeal, the record is inadequate to review this claim, and no constitutional violation clearly existed to deprive the defendant of a fair trial. Because the record does not conclusively establish whether this issue was preserved, we extend the benefit of the doubt to the defendant as the trial court clearly understood the claim to be of constitutional magnitude.

[21] The defendant also contends that the prosecutor's proffered explanation would exclude individuals such as Tiger Woods, who describes himself as "Cablinasian" based on his Caucasian, African-American, American-Indian and Asian ancestry. This argument is unpersuasive. First, a party would have the ability to question, during voir dire, a venireperson who gives such a response; in such a dialogue, the logic behind the choice of "Cablinasian" would be revealed. The trial court then would be in the best position to determine if the venireperson's answer was indeed "unusual" and whether the party's challenge was merely pretextual.

In addition, we note that a response of "human" to the question of race is particularly unusual because, generally, race refers to specific physical characteristics based on ethnicity and ancestry; see, e.g., *Saint Francis College* v. *Al-Khazraji*, supra, 481 U.S. 613; rather than the human race generally. Indeed, at least one other jurisdiction has found that the response of "human" to the question of race in a juror questionnaire is "unusual." *People* v. *Lomax*, 49 Cal. 4th 530, 565, 234 P.3d 377, 112 Cal. Rptr. 3d 96 (2010).

[22] It is easy to imagine other situations in which a potential juror's answer to a questionnaire might be troubling. If a juror wrote "refrigerator" for his or her address, for example, it would be reasonable for an attorney to find that answer disconcerting, ask about it during voir dire, and exercise a peremptory challenge at his or her discretion.

[23] For example, the prosecutor could suggest that a person who would indicate that her race was "human" might hold certain beliefs about race. Exercising a peremptory challenge on the basis of such beliefs is different from exercising a peremptory challenge on the basis of the person's race. For example, if a venireperson identified her race as "Aryan," that might indicate that she held certain beliefs about race. If a party exercised a peremptory challenge against that venireperson on the basis of that answer, that explanation would not necessarily be race based simply because it focused on the race question in the juror questionnaire.

[24] See, e.g., *Hernandez* v. *New York*, supra, 500 U.S. 356 (accepting district attorney's explanation that he felt "very uncertain that [the prospective bilingual jurors] would be able to listen [to] and follow the interpreter" [internal quotation marks omitted]).

[25] The defendant claims that the state attempts to raise additional reasons for the peremptory challenge for the first time on appeal because, although the prosecutor referred only to the juror questionnaire at the *Batson* hearing, the state's brief refers to C.D.'s other responses regarding humans. We conclude, however, that C.D.'s answer to the juror questionnaire should be read in light of her other responses, as those responses serve to explain what she meant when she listed "human" as her race in the juror questionnaire. We also note that the prosecutor might not have found C.D.'s questionnaire response quite so disturbing if C.D. previously had not indicated that being "human" might make her less able to be impartial.

[26] "[A]n invidious discriminatory purpose may often be inferred from the totality of the relevant facts, including the fact, if it is true, that the [classification] bears more heavily on one race than another." (Internal quotation marks omitted.) *Hernandez* v. *New York*, supra, 500 U.S. 363.

[27] The defendant also contends that there is evidence of discriminatory intent in a specific comment that the prosecutor made during the proceedings in the present case: "I would only indicate for the record . . . that [defense counsel] is a white male, and if he wrote 'human' on his questionnaire, if he were in front of me, *in all likelihood*, I would not select him as a juror either . . . ." (Emphasis added.) The defendant argues that, because the prosecutor would not *necessarily* have excluded defense counsel, but did exclude C.D., the prosecutor acted with discriminatory intent.

This argument is unpersuasive. The defendant reads too much into the words "in all likelihood . . . ." The fact that the prosecutor did exercise a peremptory challenge against C.D. does not necessarily mean that he would have done so with respect to a minority venireperson in all cases. In addition, we note that the prosecutor did not initially bring race up in the dialogue but, rather, was responding to the allegation by the defense that his peremptory challenge was motivated by race.

[28] The defendant relies on social science studies that indicate that minority and multiracial Americans are more likely to self-identify in an "unusual" way. These sources, however, do not prove that our current practices discourage or prohibit minority or multiracial Americans from participating in jury service.

[29] The defendant contends that it is unfair to use answers to the race question because the juror questionnaire provides that "information concerning race and ethnicity is required solely to enforce nondiscrimination in jury selection." That statement does not necessarily mean, however, that the manner in which an individual responds to such a question cannot cause a party to be concerned about the individual's ability to serve as an impartial juror. It is unreasonable to think that a venireperson would read this instruction in an official document and believe that it gives him or her the freedom to write any sort of ridiculous, obscene, or threatening words that he or she wishes.